United States District Court
Southern District of Texas

**ENTERED**

September 21, 2016

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| MARCUS DESHUNN FREEMAN, | § | |
| (TDCJ-CID #1708920) | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-15-0932 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND OPINION**

Petitioner, Marcus Deshunn Freeman, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging two convictions in the 183rd Judicial District Court of Harris County, Texas. Respondent filed a motion for summary judgment, (Docket Entry No. 16), and copies of the state court record. Freeman, with the assistance of counsel, has filed his response. (Docket Entry No. 21). After consideration of the motion and response, the record, and applicable authorities, the court grants respondent's motion. The reasons for this ruling are stated below.

**I.    Background**

A jury found Freeman guilty of the felony offenses of possession with intent to deliver cocaine and possession with intent to deliver codeine. (Cause Numbers 1238767 and 1238768). Freeman pleaded true to the enhancement paragraphs relating to prior convictions for possession of a controlled substance in Cause Numbers 834756 and 885474. On April 19, 2011, the jury sentenced Freeman to twenty-five years imprisonment in each cause. The First Court of Appeals of Texas

affirmed Freeman's convictions on April 30, 2013.  The Texas Court of Criminal Appeals refused Freeman's petitions for discretionary review on July 24, 2013.  Freeman filed applications for state habeas corpus relief on July 8, 2014, which the Texas Court of Criminal Appeals denied without written order, on findings of the trial court, without a hearing on March 25, 2015.  (Docket Entry No. 13-23, *Ex parte Freeman,* Application No. 82,926-01 at 1; Docket Entry No. 13-27, *Ex parte Freeman,* Application No. 82,926-02 at 1).

On April 9, 2015, this court received Freeman's federal petition.  Freeman contends that his convictions are void for the following reasons:

(1) Trial counsel, Troy S. Locklear, rendered ineffective assistance by:

    (a) failing to present evidence to show that Freeman did not live at 5315 Keystone; and

    (b) failing to object to the State's improper remarks during its closing argument;

(2) The prosecutor introduced false evidence and made improper remarks during its closing argument;

(3) The trial court erred when it failed to give him extra time to get testimony from a fact witness;

(4) He was denied a fair trial because the trial court refused to sustain his motion to suppress the search warrant;

(5) He is actually innocent;

(6) The cumulative effect of these errors violated his due process rights;

(7) The length of his sentence constitutes cruel and unusual punishment; and

(8) The evidence was legally insufficient to support his convictions.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 16-20).

II.    **Statement of Facts**

The appellate court summarized the facts as follows:

> The Houston Police Department received information that narcotics were being trafficked from a single-family residence located at 5315 Keystone Street. After conducting some surveillance of the property, Officer S. Bryant, the lead investigator, sent a confidential informant and another officer, K. Jacobs, to the home to execute a controlled buy. Officer Jacobs, who was posing as the informant's girlfriend, witnessed Freeman sell crack cocaine to the informant from the front doorway of the home. Based on information obtained as a result of the controlled buy, Officer Bryant obtained a "no knock" search and arrest warrant for 5315 Keystone Street.

> Officer Bryant and the other members of his team executed the warrant five days after the controlled buy took place. When they arrived at the property, the officers found two men standing in front of the main house and another man inside the main house. During the search, a marked patrol unit that was watching the perimeter of the property alerted them that two more men—one of whom was later identified as Freeman—were exiting a second, smaller, unattached building located at the rear of the property. The officers went to the backyard where they encountered two pit bulls. One of the officers discharged his weapon to protect the officers from the aggressive animals. They then detained Freeman and his companion. Freeman was later arrested and found to be carrying over $800 in cash.

> After Freeman was detained, officers conducted a thorough search of both the main house and the small, unattached building. The small, unattached building was a ten-foot-by-ten-foot recording studio, with a seating area and a singing booth. When the officers entered the studio they found two more men inside. They also recovered a loaded .38 caliber Smith & Wesson revolver and a rifle from the recording studio's attic.

> When they searched the main house, officers discovered a loaded, chambered semi-automatic Glock pistol with hollow-point bullets on the nightstand in the home's only usable bedroom.[4] Two baggies of marijuana were lying next to the pistol, in plain view. Officer Bryant testified that all three of the weapons recovered from the property—the revolver, the pistol, and the rifle—were deadly weapons that were capable of causing death or serious bodily injury.

4      The second bedroom in the main house was being used for storage.

Officers also found an opened bottle labeled as promethazine and codeine phosphate syrup in a shoe box on a chair next to the nightstand. A second shoe box that contained eight additional, unopened bottles of what appeared to be the same codeine cough syrup was found in the bedroom closet. The officers also found men's clothes fitting someone Freeman's size in the bedroom, as well as mail addressed to Freeman at that address. In particular, officers found a cable work order for that address that was dated earlier that week and listed Freeman as the customer. Officer Bryant concluded, based upon the clothes and mail, that the bedroom where the codeine and loaded Glock were found belonged to Freeman.

In the kitchen of the main house, officers found a beaker lying on the counter, a scale, and a knife that could be used to manufacture crack cocaine. They also found several baggies in one of the kitchen drawers, each containing what appeared to be a "cookie" of crack cocaine. The crime lab later determined that one of those baggies contained 32.1 grams of crack cocaine.[5] Officers also found a recent electric bill for the property in the kitchen area that was addressed to Freeman. Inside the black Chevy Impala parked in the driveway, officers also found paperwork indicating that Freeman was doing business as "Full Metal Jacket Records," and bank records for Full Metal Jacket Records listing 5315 Keystone Street as the business's address.

5      The criminalist who tested the contents of the baggie testified that she weighed all of the baggies, but only tested the contents of one because even if all of the other baggies contained crack cocaine, the total amount would not exceed 200 grams, and therefore would not move the offense into the next penalty group.

Freeman's mother testified that she owned the home at 5315 Keystone, but had moved out three years before officers searched the property. She testified that another one of her sons lived in the house with his son and another man. She also testified that Freeman did not live in the house, but he did spend a lot of time in the recording studio he built in the back of the property. According to Freeman's mother, ten people, including herself and Freeman, received mail at the house.

*Freeman v. State*, Nos. 01–11–00288–CR, 01–11–00289–CR, 2013 WL 1804471, at *1-2 (Tex. App. -- Houston [1st Dist.] 2013, pet. ref'd)(not designated for publication).

## III.   The AEDPA Standard of Review

Under 28 U.S.C. § 2254(d), a federal court may grant a habeas writ for a defendant convicted under a state judgment only if the state courts' adjudication of the defendant's constitutional claim (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court, (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent, or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100–101 (2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); 28 U.S.C. § 2254(d).

The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Id.*  Under those provisions, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002).

Similarly, federal courts defer to a state court's factual determinations, presuming all factual findings to be correct. *See* 28 U.S.C. § 2254(e)(1),(2). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

## IV.    The Issues of Exhaustion and Procedural Default

### (Grounds 3 & 8)

The scope of federal habeas review is limited by the intertwined doctrines of procedural default and exhaustion. *Bledsue v. Johnson,* 188 F.3d 250, 254 (5th Cir. 1999). Ordinarily, a state prisoner seeking federal habeas relief must first "exhaus[t] the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A), thereby affording those courts "the first opportunity to address and correct alleged violations of [the] prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731 (1991). The adequate and independent state ground doctrine furthers that objective, for without it, "habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court." *Walker v. Martin*, 131 S. Ct. 1120 (2011) (quoting *Coleman*, 501 U.S. at 732). Exhaustion requires that the prisoner "have fairly presented the substance of his claim to the state courts." *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997). Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 846

(1999).   "Determining whether a petitioner exhausted his claim in state court is a case- and fact-specific inquiry." *Moore v. Quarterman,* 533 F.3d 338, 341 (5th Cir. 2008) (en banc).

In Texas, a criminal defendant may challenge a conviction by taking the following paths: (1) the petitioner may file a direct appeal followed, if necessary, by a petition for discretionary review in the Texas Court of Criminal Appeals; and/or (2) he may file a petition for writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure in the convicting court, which is transmitted to the Texas Court of Criminal Appeals once the trial court determines whether findings are necessary. *See* TEX. CODE CRIM. PROC. art. 11.07, § 3(c); *see also Busby v. Dretke,* 359 F.3d 708, 723 (5th Cir. 2004) ("Habeas petitioners must exhaust state remedies by pursuing their claims through one complete cycle of either state direct appeal or post-conviction collateral proceedings.").

A federal court generally cannot review the merits of a state prisoner's habeas petition if the claims in the petition are procedurally defaulted.  *See, e.g., Magwood v. Patterson,* 561 U.S. 320, 340 (2010) ("If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention - whether in trial, appellate, or habeas proceedings, as state law may require - procedural default will bar federal review.").  A habeas claim can be procedurally defaulted in either of two ways. *Coleman v. Dretke,* 395 F.3d 216, 220 (5th Cir. 2004), *cert. denied,* 546 U.S. 938 (2005). *See generally O'Sullivan v. Boerckel,* 526 U.S. 838, 850–56 (1999) (Stevens, J., dissenting) (explaining the differences between the two varieties of procedural default); *Bledsue v. Johnson,* 188 F.3d 250, 254 (5th Cir. 1999).

First, "[p]rocedural default . . . occurs when a prisoner fails to exhaust available state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Williams v. Thaler,* 602

F.3d 291, 305 (5th Cir. 2010).  When state remedies are rendered unavailable by petitioner's own procedural default, or when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review." *Sones v. Hargett,* 61 F.3d 410, 416 (5th Cir. 1995) (quoting *Steel v. Young,* 11 F.3d 1518, 1524 (10th Cir. 1993); *see also Coleman v. Thompson,* 501 U.S. 722, 736 n.1 (1991)) ("[I]f the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, . . . [then] there is a procedural default for purposes of federal habeas . . . .").

Second, if the prisoner has presented the claim to the highest available state court but that court has dismissed the claim on a state-law procedural ground instead of deciding it on the merits, the claim has been decided on an independent and adequate state-law ground. *See, e.g., Harris v. Reed,* 489 U.S. 255, 262 (1989).  "If a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for dismissal, the prisoner has procedurally defaulted his federal habeas claim." *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997), *cert. denied,* 523 U.S. 1139 (1998).  The state procedural rule must be "both independent of the merits of the federal claim and an adequate basis for the court's decision." *Finley v. Johnson,* 243 F.3d 215, 218 (5th Cir. 2001).  A state procedural rule is an adequate basis for the court's decision only if it is "strictly or regularly applied evenhandedly to the vast majority of similar claims." *Amos v. Scott,* 61 F.3d 333, 339 (5th Cir.) (emphasis omitted), *cert. denied,* 516 U.S. 1005 (1995).

In ground 3, Freeman complains that the trial court erred when it failed to give him extra time to get testimony from a fact witness.  Respondent contends that this claim is procedurally barred because the state habeas court expressly refused to consider it on collateral review.

The state habeas court found:

> 7.    The applicant's habeas challenge alleging that the trial court erred by failing to give the defense additional time is a record claim that should have been raised on direct appeal; because the applicant failed to raise this claim on direct appeal, he is procedurally barred from raising it in the instant proceeding. *Ex parte Nelson,* 137 S.W.3d 79, 81 (Tex. Crim. App. 2004); *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex Crim. App. 1996) (op. reh'g).

(Docket Entry No. 13-25, State Court Records, p. 30).

In ground 8, Freeman challenges the sufficiency of the evidence.  In *Ex parte Grigsby*, 137 S.W.3d 673 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals held:

> In our writ jurisprudence, it is well-established that a challenge to the sufficiency of the evidence used to sustain a felony conviction is not cognizable on an application for a post-conviction writ of habeas. *Ex parte Williams,* 703 S.W.2d 674, 677 (Tex. Crim. App. 1986); *Ex parte Easter,* 615 S.W.2d 719, 721 (Tex. Crim. App. 1981).
>
> As such, Applicant's first ground for relief is denied. In denying Applicant's attack on the sufficiency of the evidence, we take this opportunity to clarify our disposition of habeas corpus applications where an applicant advances a challenge to the sufficiency of the evidence and we deny the application without written order. In *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997), in addressing whether the applicant's subsequent petitions were barred under Article 11.07, Section 4, of the Texas Code of Criminal Procedure, we determined that "a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits." However, we also held that "[a] disposition is related to the merits if it decides the merits or makes a determination that the merits of the applicant's claims can never be decided." *Id.* (emphasis

added).  A challenge to the sufficiency of the evidence presents one
of those instances where we can never consider the merits of the
applicant's claim. Therefore, today, we reaffirm our holding that
where an applicant challenges the sufficiency of the evidence on an
application for a writ of habeas corpus, and we subsequently dispose
of the application by entering a denial without written order, the
applicant's sufficiency claim was denied because the claim is not
cognizable.

*Ex parte Grigsby*, 137 S.W.3d 673 (Tex. Crim. App. 2004).

Freeman challenged the sufficiency of the evidence on direct appeal.  *Freeman*, 2013 WL

1804471, at *2–5.   However, he did not raise any sufficiency challenge in his petition for

discretionary review before the Texas Court of Criminal Appeals. *Freeman*, Nos. PD-707-13, PD-

708-13.

The state habeas court rejected Freeman's argument, stating: "5. The applicant's challenges

to the sufficiency of the evidence are not cognizable in post-conviction habeas proceedings. *Ex parte*

*Christian*, 760 S.W.2d 659, 660 (Tex. Crim. App. 1988)." (Docket Entry No. 13-25, p. 29).

The Texas Court of Criminal Appeals denied Freeman's state application without written

order on findings of the trial court.  Like the state habeas court in *Grigsby*, the state habeas court in

this case did not address the merits of Freeman's challenge to the sufficiency of the evidence.  The

state habeas claims were defaulted based on adequate and independent state grounds.  This claim is

procedurally-barred in federal court. *See, e.g., Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005).

To overcome the procedural bar, Freeman must "demonstrate cause for the default and actual

prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider

the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722,

750 (1991); *Wainwright v. Sykes,* 433 U.S. 72, 87-91 (1977); *Ries v. Quarterman,* 522 F.3d 517,

523-24 (5th Cir. 2008). Freeman offers no arguments that would excuse the procedural default. Freeman's sufficiency-of-the-evidence and trial court error claims are dismissed because they are procedurally barred.

## V. The Claim Based on a Violation of the Fourth Amendment

### (Ground 4)

Freeman argues that the search warrant was not based on probable cause. He asserts that the search warrant affidavit contains wholly conclusory, unattributed statements, and because the reliability and trustworthiness of the confidential informant is not adequately established, no probable cause existed to support the issuance of a search warrant in this case. Freeman argues that this evidence was the fruit of a poisonous tree and violated the Fourth Amendment. Under the "fruit of the poisonous tree" doctrine, all evidence produced as a result of an illegal search or seizure must be suppressed, unless the Government can show that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Brown v. Illinois*, 422 U.S. 590, 602-03 (1975); *United States v. Dortch*, 199 F.3d 193, 200-01 (5th Cir. 1999).

Freeman's illegal search and seizure claim fails. Freeman is precluded from relitigating his Fourth Amendment claim in this federal habeas proceeding, where, as here, the State provided an opportunity for full and fair litigation of the claim in state court. When such an opportunity is provided, a state prisoner may not secure federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. *Stone v. Powell,* 428 U.S. 465, 494 (1976). A federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a

full and fair litigation of that claim at trial and on direct review. *Id.* at 495 n.37. The decision in *Stone* does not mean that the federal court lacks jurisdiction over such a claim, but only that the application of the rule is limited to cases in which there has been both such a showing and a Fourth Amendment violation. *Id.; see also Davis v. Blackburn,* 803 F.2d 1371, 1372 (5th Cir. 1986).

Under *Stone,* search and seizure claims are precluded unless the petitioner presents sufficient "allegations that the processes provided by the state to fully and fairly litigate Fourth Amendment claims are routinely or systematically applied in such a way as to prevent the actual litigation of Fourth Amendment claims on their merits." *Williams v. Brown,* 609 F.2d 216, 220 (5th Cir. 1980). If the state court record reflects that the petitioner's opportunity to challenge the introduction of evidence was "not circumscribed," a federal habeas court will not "scrutinize a state court's application of fourth amendment principles." *Billiot v. Maggio,* 694 F.2d 98, 100 (5th Cir. 1982). Texas law provided Freeman a full opportunity to litigate his Fourth Amendment claims through pretrial motions to suppress evidence. TEX. CODE CRIM. PROC. art. 28.01, § 1(6). *See also Self v. Collins,* 973 F.2d 1198, 1208 (5th Cir. 1992)(finding claim barred by *Stone* because the petitioner did not challenge the legality of his arrest, the state had no reason to prove otherwise, and the Texas state courts had no opportunity to consider the issue), *cert. denied,* 507 U.S. 996 (1993). At trial, counsel strenuously objected to the introduction of the codeine and cocaine seized during the search of Freeman's home. Freeman has not shown that the state court's process of litigating Fourth Amendment claims is routinely or systematically applied in such a way as to prevent actual litigation of such claims, or that it was so applied in his case. Freeman's Fourth Amendment challenge to the seizure of evidence from the 5315 Keystone address is not cognizable on habeas review because the state court provided an opportunity for "full and fair" litigation of that challenge. *Stone,* 428 U.S.

at 494 (1976).  The bar of *Stone v. Powell* applies despite any state trial court error in deciding the merits of Freeman's Fourth Amendment claim. *Andrews v. Collins,* 21 F.3d 612, 631-32 (5th Cir. 1994); *Christian v. McKaskle,* 731 F.2d 1196, 1199 (5th Cir. 1984).

Freeman is not entitled to the relief he seeks.

## VI.    The Claim Based on Actual Innocence

### (Ground 5)

Freeman argues that he is actually innocent.  A claim of actual innocence based on newly discovered evidence, independent of any constitutional violation or error, cannot serve as a ground for federal habeas relief. *Herrera v. Collins*, 506 U.S. 390 (1993).  The United States Supreme Court noted in *Herrera v. Collins*, 506 U.S. 390, 416-417 (1993):

> Federal habeas review of state convictions has traditionally been limited to claims of constitutional violations occurring in the course of the underlying state criminal proceedings.  Our federal habeas cases have treated claims of "actual innocence," not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas petition would otherwise be regarded as successive or abusive.  History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency.

*Id.* at 416-17.

A defendant who has received a fair trial and has been convicted, no longer enjoys the presumption of innocence. *Id.*  The purpose of federal habeas courts is to ensure that individuals are not imprisoned in violation of the Constitution, not to correct errors of fact. *Id.*  The petitioner's claim of actual innocence cannot serve as a separate basis for habeas relief.

The Fifth Circuit has repeatedly upheld a district court's conclusion that a petitioner's claim of actual innocence does not provide a separate basis for habeas relief. *See Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (independent claim for federal habeas relief based on actual innocence not cognizable in federal habeas proceedings); *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999), *cert. denied*, 529 U.S. 1097 (2000) (same); *Robison v. Johnson*, 151 F.3d 256, 267 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999) (same); *Lucas v. Johnson*, 132 F.3d 1069, 1074-75 (5th Cir.), *cert. dismissed*, 524 U.S. 965 (1998) (same).

The state habeas court concluded:

> 6.   The applicant fails to allege sufficient facts which, if true, would show that there is newly discovered evidence of the applicant's innocence and that, by clear and convincing evidence, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the alleged new evidence. *Ex parte Elizondo*, 947 S.W.2d 202, 206 (Tex. Crim. App. 1996).

(Docket Entry No. 13-25, p. 30).

This court must afford the state court's factual findings a presumption of correctness, which Freeman has failed to rebut. 28 U.S.C. § 2254(d)(2). The state court's decision was a reasonable application of the law to the facts and was not contrary to clearly established federal law as determined by the Supreme Court of the United States. Relief cannot be granted under 28 U.S.C. § 2254(d)(1).

Freeman is not entitled to federal habeas corpus relief on this claim.

## VII.    The Claims Based on Prosecutorial Misconduct

(Ground 2)

### A.    The Claim Based on the Knowing Use of False Testimony

Freeman claims that the prosecutor knowingly presented false and perjured testimony. Freeman contends that the confidential informant who masterminded the sting operation and identified Freeman as a drug dealer knew that police officers were arresting the wrong man. Freeman explains that his physical description did not match the description on the search and arrest warrant.  Police were searching for a taller, darker-skinned individual with a crew cut and a goatee, whereas Freeman is bald and clean-shaven, and has been for many years.  Furthermore, police officers testified that they found Freeman's clothing and evidence that he lived in the house where the drugs were found.  Freeman argues that the prosecution failed to make an affirmative link that establishes that Freeman actually lived at the Keystone residence or that the clothes belonged to Freeman.

To establish a basis for relief, a petitioner must prove that the prosecution knowingly presented false testimony. *Napue v. Illinois,* 360 U.S. 264 (1959).  Mere inconsistencies or errors in a witness's testimony do not, standing alone, establish the existence of perjury. *Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990).  The jury heard the testimony of the police officers who conducted the search of the Keystone residence, and they could decide whether the discrepancies in their testimony affected the credibility of their testimony.  Freeman's conclusional assertions that their testimony was false, and the mere contradictory testimony of the officers, were insufficient to show that the State knowingly presented false, material testimony. *See United States v. Leahy,* 82 F.3d 624, 632 (5th Cir. 1996); *United States v. Washington,* 44 F.3d 1271, 1282 (5th Cir. 1995).

Although it offends constitutional due process for a prosecutor to knowingly use or intentionally fail to correct testimony that he knows to be false, nothing in the record suggests that the testimony of the police officers was false or that the State prosecutors knew their testimony to be false in any respect. *See Napue v. Illinois*, 360 U.S. 264, 271 (1959).  Discrepancies in witnesses' testimony merely establish a credibility question for the jury and do not suffice to establish that the testimony was false. *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988).

### B.     The Prosecutor's Improper Closing Argument

Freeman next asserts that the prosecutor's closing argument was improper.  The following is an excerpt of the prosecutor's closing argument:

> Now, in order for you to find Marcus Freeman not guilty in this case, you would have to go back to that jury room and you would have to decide amongst yourselves that those police officers lied.  That every single one of them came in here and took the  witness stand and perjured themselves. You would have  to believe that Officer Maxwell was willing to risk 17 years of his career for one Defendant. You would have to believe that the two officers, Armstrong and Officer Kim Jacobs who worked undercover, who have taken years to get that training and the trust that the city  requires to then send them out not, in large patrol cars, not in uniforms, where they put their lives at risk. Let's be real honest. They go to people's homes. That have assault rifles and revolvers and pistols and sell drugs and they do that for us. So, in order to find him not guilty, you have to believe that every single one of those people was willing to come in here and lie.  And why would they do that? That is their  job. That is what they're trained to do. They're still here. They work at night. They come every day because they care about this case. They care about the job that  they did. And they want you to believe them because they told the truth.  You would have to go back there and believe that they went and conducted surveillance on 5315 Keystone. You would have to believe that they got information from their confidential informant. You would have to believe that then that they bought drugs  from someone. But instead of wanting to get the real

suspect, the real person that sold the drugs that really matches the description of the person with a crew cut being -- versus having a bald head, that they said no, no, no. We don't want the real drug dealer. Why would we want to arrest him? We want to arrest Marcus Freeman. For what reason? That's what they do. They got solid information. They went and confirmed it with one of their own officers. And then they went and executed the search warrant. And shockingly enough, there it all was, right in his home. And I want to go over State's Exhibit 77. We talked and we met the Sheriff's deputies that the Defense subpoenaed. I would like to point out to you guys that the Defense has the same subpoena power as myself. They can call down here anyone they want. They have an absolute right not to put on a case. But that is their choice. They brought you a Harris County sheriff's deputy to bring us the booking photo and information. And when I had an opportunity to cross-examine the deputy, I also got Marcus Freeman's information. And on here it said he's 5-8. We went over with the deputy how they get this information. It's self-reported. His address on here is 5315 Keystone. The same location that his mom told us that she owns, that she visited one to two times a week, that he went to frequently. The same location where he receives all of his mail. This is his home. This is where he lives. But they want us to believe that all of these officers lied, that all these officers had the real suspect out there and they just wanted to let him go and arrest this guy. Why? Why just take the wrong guy? So they can go do it all again? I'm going to sit down. I'm going to have a moment to talk to you again after opposing counsel does. But I want you to think about that. Why would they arrest the wrong guy? Why risk their whole career on one guy?

(Docket Entry No. 13-8, pp. 106-108).

Initially, Freeman has not shown that the prosecutor's statements were improper. Where a defendant had objected to allegedly improper statements made by a prosecutor, and the district court admitted the challenged statements over the defendant's objection, this court reviews the admission of those statements for abuse of discretion. *United States v. Gracia,* 522 F.3d 597, 600 n.2 (5th Cir. 2008) (citations omitted). In doing so, "we must first decide whether the prosecutor made an improper remark" and, "if an improper remark was made, we must determine whether the remark

affected the substantial rights of the defendant." *Id.* (citations omitted). To determine whether a remark prejudiced the defendant's substantial rights, this court must assess "the magnitude of the statement's prejudice," "the effect of any cautionary instructions given," and "the strength of the evidence of the defendant's guilt." *United States v. Gallardo–Trapero,* 185 F.3d 307, 320 (5th Cir. 1999) (citations and internal quotation marks omitted).

Where the defendant had made no contemporaneous objection to the challenged statements, this court reviews only for plain error. *Gracia,* 522 F.3d at 600 n.2 (citations omitted). To demonstrate plain error, the defendant must show that there was error, it was plain, and it affected his or her substantial rights. *Id.* at 600 (citations omitted). Even if the defendant can meet this burden, "we still would have discretion to decide whether to reverse, which we generally will not do unless the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceeding." *Id.* (citations omitted).

Under Texas law, the four permissible areas of jury argument are: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answer to the argument of opposing counsel, and (4) pleas for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex. Crim. App. 1999). "[A] prosecutor's closing argument cannot roam beyond the evidence presented during trial: Except to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses." *Gallardo–Trapero,* 185 F.3d at 320 (alteration, citation, and internal quotation marks omitted). Nonetheless, for "improper comment or questioning to represent reversible error, it generally must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Castillo,* 77 F.3d 1480, 1497 (5th Cir. 1996) (citation and internal quotation marks omitted).

Through his cross-examination of the State's witnesses, counsel tried to cast doubt on their identification of Freeman as the person who sold drugs to the confidential informant. Counsel also tried to show that there was no evidence linking Freeman to the drugs found in the Keystone residence. Here, the prosecutor argued that the jury would have to believe that all of the police officers were lying in order to find that Freeman was not guilty of the charged offenses. Therefore, even if the statement was improper under *Gallardo–Trapero,* it certainly was not "so pronounced and so persistent that it permeate[d] the entire atmosphere of the trial."

Freeman raised this issue on appeal. In rejecting this claim, the appellate court stated:

> In his third and fourth issues, Freeman contends that the State made two improper jury arguments that deprived him of a fair trial.
>
> A. Standard of Review
> Permissible jury argument by the State generally falls into four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) pleas for law enforcement; and (4) response to opposing counsel. *Jackson v. State,* 17 S.W.3d 664, 673 (Tex. Crim. App. 2000); *Dominguez v. State,* 125 S.W.3d 755, 763 (Tex. App.-Houston [1st Dist.] 2003, pet. ref'd). Even when an argument exceeds the permissible bounds of these approved areas, it will not constitute reversible error unless, in light of the record as a whole, the argument is manifestly improper or injects new, harmful facts into the case, *see Jackson,* 17 S.W.3d at 673–74, and affects the defendant's substantial rights. *See Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (improper jury arguments are generally considered non-constitutional error); *see also* Tex. R. App. P. 44.2(b) (non-constitutional errors not affecting substantial rights are disregarded.). In determining whether a defendant's substantial rights are affected, we balance three factors: 1) the misconduct's severity, 2) the measures adopted to cure the misconduct, and 3) the certainty of punishment without the misconduct. *See Hawkins v. State,* 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).
>
> To preserve jury argument error, a defendant must contemporaneously object and obtain an adverse ruling. *Cockrell v. State,* 933 S.W.2d 73, 89 (Tex. Crim. App. 1996); *Dominguez,* 125

S.W.3d at 763. If the objection is sustained, the defendant must request an instruction to disregard the argument and, if granted, must move for mistrial. *Cockrell,* 933 S.W.2d at 89; *Dominguez,* 125 S.W.3d at 763.

B. "All cops are liars"

In his third issue, Freeman argues that the State impermissibly argued that the only way the jury could reach a verdict of "not guilty" was if the jurors concluded that all of the police were "lying" under oath. Although he acknowledges that he never objected to the State's comments at trial, he argues that we should nevertheless reach this argument based upon the Supreme Court's opinion in *Living Centers of Texas Inc. v. Penalver,* 256 S.W.3d 678, 680–81 (Tex. 2008). However, the Court of Criminal Appeals has held that a defendant's failure to object to an improper jury argument in a criminal case forfeits his right to complain about the jury argument on appeal. *See Cockrell,* 933 S.W.2d at 89 (holding defendant's failure to object to jury argument, or failure to pursue adverse ruling on his objection to jury argument, forfeits his right to complain about jury argument on appeal); *Marin v. State,* 851 S.W.2d 275, 279 (Tex. Crim. App. 1993) (holding defendant's "right" not to be subjected to incurable erroneous jury arguments is one of those rights that is forfeited by failure to insist upon it).

We overrule Freeman's third issue.

C. "Pit bull dog owners are drug dealers"

In his fourth issue, Freeman complains that the trial court erred in denying his request for an instruction to disregard the State's argument regarding a connection between drug dealers and pit bull dogs. During its closing argument, the State argued: "This is [Freeman's] cash. It's right here. You can read the inventory on the front of it. Drugs, cash. Oh, let's not forget all the guns. But we'll get back to that because what do drug dealers use to protect their products? They use guns. They use pit bulls. That happened to be there, too." The defense objected on the ground that the State was arguing facts outside the scope of the record (i.e., that Freeman owned the pit bull dogs found at the residence). The court sustained the objection. The defense then moved for an "instruction regarding the pit bulls." The court denied that motion, but instructed the State to "stay in the record, please." Freeman argues that he was harmed by the State's argument, which was intended to arouse the passions and prejudices of the jury.

In this case, the evidence demonstrated that two pit bull dogs were in the backyard, between the main residence and the recording studio, when the warrant was executed, and that the dogs were so aggressive that one of the officers discharged his weapon to protect himself and the other officers from the animals. The evidence also linked Freeman to both buildings, as well as the narcotics and weapons the officers found inside them. Officer Bryant also testified that firearms are normally involved to protect the narcotics. The State's comment that the aggressive, pit bull dogs on the property were also there to protect the narcotics is a reasonable, logical deduction, and as such, was not improper. *See Jackson,* 17 S.W.3d at 673 (permissible jury argument by State includes reasonable deductions from evidence).

We overrule Freeman's fourth issue.

*Freeman v. State*, Nos. 01–11–00288–CR, 01–11–00289–CR, 2013 WL 1804471, at 5-7 (Tex. App. -- Houston [1st Dist.] 2013, pet. ref'd)(not designated for publication).

The Court of Criminal Appeals denied habeas relief. The state court's decision as to the prosecutorial misconduct claim reasonably applied the law to the facts, consistent with clearly established federal law. Freeman has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

## VIII.   The Claims of Ineffective Assistance of Counsel

### (Ground 1)

### A.      The Legal Standard

A § 2254 motion claiming ineffective assistance of counsel is analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, the movant must demonstrate that his counsel's performance was both deficient and prejudicial. *Strickland*, 466 U.S. at 687. This requires showing that counsel's performance was outside the broad range of what is considered reasonable assistance

and that this deficient performance led to an unfair and unreliable conviction and sentence. *United States v. Dovalina*, 262 F.3d 472, 474-75 (5th Cir. 2001).

Counsel's performance is constitutionally deficient if it falls below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[J]udicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effects of hindsight." *Id.* at 689. An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because otherwise "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Id.*

The prejudice element requires the movant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If the movant fails to prove one prong of the *Strickland* test, it is not necessary to analyze the other. *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one."). "Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim." *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997).

Under the AEDPA, this court's task is to assess whether the state courts were reasonable in denying Freeman's *Strickland* claims. While "[s]urmounting *Strickland*'s high bar is never an easy task," a habeas petitioner's duty to "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,'. . . and

when the two apply in tandem, review is 'doubly so.'" *Harrington v. Richter*, 562 U.S. 86, 105 (2011); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### B.     Failure to Show that Freeman did not Reside at the Keystone Residence

Freeman complains that counsel failed to present witnesses or law to adequately prove Freeman did not live at 5315 Keystone. Freeman argues that clothing found at the scene which allegedly belonged to him was too baggy and could have fit anyone. Freeman further states that mail for numerous other individuals was found at the scene. Freeman asserts that counsel failed to call any of the witnesses produced by Freeman's mother. Counsel failed to make attempts to ferret out plausible explanations for the prosecution's allegations that the clothes found in the main house at 5315 Keystone did not belong to Freeman but instead belonged to Alton Mathis, who fit the description in the search warrant. Freeman states that his mother brought numerous photographs of Alton Mathis wearing the mentioned clothing in an attempt to show that Freeman was innocent of the charged offense.

Freeman offers four affidavits in support of this claim.

Leslie Baxter testified as follows:

> 2. "I am Marcus Freeman's mother. I worked with Attorney Troy Locklear to assist with the defense of my son Marcus Freeman. Mr. Locklear was the trial attorney in charge."

> 3. "I would like to reply to the affidavit by attorney Troy Locklear written in response to my son's state writ of habeas corpus. Mr. Locklear says in the affidavit that he never knew that my son entered the house, but I am positive that attorney Troy Locklear knew that my son never entered the house at 5315 Keystone on the day he was arrested."

> 4. "Attorney Locklear and everyone else working with the case was aware that the backdoor of the main house was boarded up. The

attorney knew my son went directly to his studio in the back of the house with some chicken in hands. He knew he never entered the main house."

5. "It was my belief and understanding that our attorney would be calling me and other witnesses on the date of the trial. We waited outside but Mr. Locklear did not call anyone but me. These other witnesses were not called. My son begged the attorney to call these other witnesses, but he did not do so. Kye Williams, Alton Mathis, Deandre Taylor and Carol Pennington were willing to testify. None of these persons were called.["]

6. "I would like to urge a judge to grant my son's federal writ of habeas corpus and let us please have a new trial because it seems like they convicted him because he had a couple bills in his name addressed at 5315 Keystone, but he lived with me and never had anything to do with any drugs or weapons found in the house at 5315 Keystone, which I owned. He only ran his music business out of the studio out back. There were many other people who received mail at that house and who actually lived in the house. This is a case of mistaken identity."

(Docket Entry No. 4-1, Ex. A, pp. 27-28).

Alton Mathis testified as follows:

My name is Alton Mathis and I am 28 years of age. I reside at 5315 Keystone, Houston Texas 77021[.] I voluntarily make the following statement regarding the events that took place on or about October 27, 2009 that led to the wrongful arrest of Marcus D. Freeman[.] I am Marcus Freeman's Nephew. I lived at 5315 Keystone all of my life and I lived there at the time that he was arrested. I live there with my father, John Pennington. When Marcus came to the house, he had food with him. We were in the studio in the back yard. Marcus did not have codeine cough syrup. That was found in my room and belonged to Joey Jackson. I don't know of any cocaine in the house nor do I believe that there was any cocaine in the house. Marcus does not sell drugs, I don't sell drugs nor does my father.

(Docket Entry No. 4-1, Ex. B, p. 34).

Kye A. Williams testified as follows:

My name is Kye A. Williams and I am 37 years of age. I reside at 9611 Grant Rd. Apt 2433, Houston, Texas 77070. I voluntarily make the following statement regarding the events that took place on or about October 27, 2009 that led to the wrongful arrest of Marcus D. Freeman[.] I am Marcus Freeman's friend. I lived in the studio out back for 5 years prior and Marcus did not live here nor did he live in the main house. When he came to the property, he would come directly to the studio where he conducted his business. Other people were living in the main house. Marcus did not go into the house at all on the day that he was arrested. He was not connected with crimes he is being charged for. He didn't do it. He never had control, care or custody of any of drugs nor weapons. He had no knowledge of anything illegal that may have been occurring on the property. Marcus lived at 3803 Mistissin Lane, Houston, Texas 77053. Marcus had been gone from living in the house at 5315 Keystone St. for 3 years prior. He only came over to use the studio.

Finally, as to the description of Marcus Freeman. He wore his hair in a bald hair cut as long as I have known him, which is from the age of 18 or 19. It is true that he has a lazy eye, he never had a crew cut or goatee, and he is around 5'6" in height.

(Docket Entry No. 4-2, Ex. C, pp. 2-3).

Deandre Taylor testified as follows:

My name is Deandre Taylor and I am 26 years of age. I reside at 5338 Dewberry, Houston Texas 77021[.] I voluntarily make the following statement regarding the events that took place on or about October 27, 2009 that led to the wrongful arrest of Marcus D. Freeman[.] On October 27, 2009, I was visiting Alton Mathis at 5315 Keystone, Houston, Texas 77021[.] He and his father, John Pennington were living at 5315 Keystone. I was in the living room by myself on the computer. John Pennington was at work. Alton was in the back in a separate building that is used as a music studio. Ronald Jackson, Kyle Williams, Devonte Taylor, John Wayne Belcher, and Dwayne Dewpoint were in the studio also.

While I was sitting in the living room Marcus Freeman drove up. He went through the gate on the side of the house to the studio in the back with Alton. He never came inside of the house.

He had food in his hands, he went to Wingstop[.]  My brother, Devonte called me on my cell to come back to the studio to shoot a scene for a video. Devonte and John Wayne left to get something to eat, they would start shooting the video after everybody finished eating. Marcus was eating at that time.  When they left, I was going into the house to use the restroom. I saw the police trying to get through the burglar bars. When they couldn't get through, they broke the window and came inside.  I ran out the back door, jumped the fence and ran around the corner.  I ran because I had marijuana on me and in the house. It was in my black bag by the window. I did not get the marijuana from Marcus nor anyone else that was in the studio.  I had been at the house all day and just before the police got there was the first time that Marcus had been at the studio that day. He never came inside of the house. Marcus lived at 3803 Mistissin Lane, Houston, Texas 77053. I knew that only John Pennington and Alton lived in the house and Kyle William lived in the studio. Marcus had been gone from living in the house for 3 years. He only came over to use the studio.  After they arrested me, they brought me back to the house.  I saw them bring out Marcus Freeman.

(Docket Entry No. 4-2, Ex. E, pp. 9-10).

In his affidavit to the state habeas court, counsel testified as follows:

1. I had many discussions with Mr. Freeman regarding trial and general strategies. We discussed the pre-trial issues related to the search warrant/Motion to Suppress. We discussed  issues related to the Motion to Disclose the Identity of the Informant. We discussed link issues. We discussed the law of parties; namely, that possession is care, custody and control and not ownership and that a person can be liable under the law of parties even if the controlled substance belongs to someone else. The primary defensive theory was that someone other than Mr. Freeman made the controlled buy and that the police arrested the wrong person. The person believed to have made the controlled buy was Alton Mathis. Someone other than Freeman was in the bedroom when the police entered and that person fled. Seems reasonable to believe the person that fled abandoned the gun or left the gun in the bedroom. It was undisputed that Freeman was in the studio in the backyard and not in the house at the time the search was executed. Really did not need witnesses to establish that point. If a witness(es) had ever told me that Freeman did not go in the house and instead walked around outside that would have been valuable to know.  But that is not what any of the witnesses including

Freeman told me.  We discussed Alton Mathis. Alton Mathis is John Pennington's son, Freeman's nephew and Ms. Baxter's grandson. Freeman was never going to allow me to call Mathis as a witness. My recollection is that Freeman had indicated Mathis was not all there mentally and we should not call him as a Witness. I believe he was incarcerated during part of the time I was representing Freeman. I was concerned that if we bench warranted him back to the Harris County Jail that the State might interview him and cause more problems for Freeman. Mathis had a prior TDC trip and several less than gram cases. Mathis would have been looking at 15 to life aggravated if the State chose to charge him with the cocaine and/or the codeine. The less than gram cases would have supported the State's theory that Mathis was a minion and that Freeman was a leader, manager, facilitator etc. The State with any or all of these witnesses might have been able to establish that this was a family house for sure, a family drug house. If Mathis would have been bench warranted and been in the County Jail he would have made phone calls and the chance that he would have said something contrary to our theory of the case is greater than the likelihood that Freeman indicated he would ever call Mathis as a witness. Those calls are recorded. Lots of bad could have resulted from Mathis being in the county jail available to the State and the weight of the risk outweighed the likelihood that he would testify in someway that would negate the links Freeman had to the house and the controlled substances. We could establish Mathis' links without Mathis and I think we did with the circumstantial evidence we had. I discussed with Mr. Freeman the range of punishment and the aggravated nature of a deadly weapon.  Mr. Freeman did not want to accept any prison sentence and there was not anything but prison the State was willing to offer. The State was willing to drop the deadly weapon paragraph, and there were indications that the State was willing to accept a significant reduction from the range of punishment if Freeman was interested in making a counter offer before the case was set for trial. During deliberation, the jury sent out what seemed to be a favorable note requesting the argument co-counsel made for 10 reasons for doubt. Some amount of time passed and the jurors sent out a note that indicated to me that they would find Mr. Freeman guilty. The Chief prosecutor assigned to the 183rd at the time was still willing to offer Mr. Freeman 15 years non-aggravated. I relayed the information to Mr. Freeman and his mother and pleaded with Freeman to take the State's plea offer. I urged him that the note was enough forewarning that the verdict would be guilty. I told him that he could take the plea and he could appeal the pre-trial issues. My recollection is that his mother, Leslie Baxter, also told him to take

27

the plea. Freeman insisted that he was "going to go all the way." Shortly thereafter the Jury came back with Guilty and found that he had used or exhibited a deadly weapon making the time he would serve aggravated. Regarding the witnesses, I met with Kye Williams more than once and he was a potential witness. I do not recall what I picked up on but somewhere along the discussion I recommended to Mr. Freeman that we should not call Mr. Williams. I have a general idea and if I need to supplement I can but strategically speaking there was an understanding at the time why Williams was not called. The information provided in the affidavit is substantially different than what I was told during my meetings with Freeman and Williams; in particular, Williams lived in the house in an area that had been added on to the house. He slept on the couch in the add-on room in the house and not in the studio. At no time was I told that someone lived in the studio that I recall. I met with Dewayne Dupont. Mr. Dupont lived across the street and was a few years older than Freeman. Dupont may have been around the approximate age of Freeman's older brother John Pennington. Dupont provided information, but there were some things that would have been damaging about Dupont's testimony and there were credibility issues. Dupont mentioned some things related to the studio that would have prevented me from calling him. I met with John Pennington who is Freeman's brother and Alton Mathis' father. Pennington lived in the house. John Pennington did not fit the description of the person that made the controlled buy, but his son Alton Mathis did. Alton Mathis had just recently started staying in the house. Seems like John Pennington had been at work at the important points in time in question. The information he provided to me seemed inconsistent, cumulative, not credible and posed risks. I do not remember exactly what he said that I based my recommendation that we not call him. I remember that at the point I interviewed him I expressed that we should not call him as a witness. I do not remember exactly speaking with Carol Pennington but seems like I did speak to her at some point. She may have been present when the family met in the conference room with me and I may have spoken to her on the phone. Her testimony was cumulative and would have posed risks generally speaking. Regarding Mr. Freeman never entering the house, this is the first I have heard that fact pattern. Regarding Mr. Freeman walking around the house to the back, as opposed to entering through the front door, walking past the living room and past the kitchen and past the part of the house that was added on (where Kye Williams stayed), and out the back door to the studio, that is not my recollection of the facts. There are other facts in the affidavits that were not the facts told to

me. In total, these witnesses posed many risks to Freeman in that they contradicted each other and would not be able to stand up to cross-examination.

2. I met with Leslie Baxter several times in person and had numerous phone conversations with her as well. My conversations with her involved the people who were regularly in and out of the house, and how this could render the evidence insufficient to affirmatively link Mr. Freeman to the drugs and weapon. We discussed possible witnesses, but I do not recall the details of specific conversations related to Ms. Baxter and the witnesses.

3. I discussed with Mr. Freeman the State's potential failure to prove affirmative links between him and drugs and the weapon found at 5313 Keystone. I discussed with Mr. Freeman the law of the parties and explained that a person does not have to have ownership of the contraband to be a party to a crime. Affirmative link issues  were discussed with Mr. Freeman on many occasions. *See* response to number 1. We provided evidence for the Jury to consider that several people received mail at the residence and that several people had care, custody and control of the residence and otherwise used and frequented the property. I discussed with Freeman several possible defense witnesses; however, the witnesses gave inconsistent and potentially harmful information when interviewed.

4. I was aware of the potential testimony by Carol Pennington. Her testimony seemed cumulative to that of Ms. Baxter and the other evidence we had. Subject to cross-examination, the weight of any benefit of the cumulative evidence would have likely been outweighed by something inconsistent or possibly not credible. The other witnesses posed significant credibility issues. I do not recall at this time anything specifically risky about Carol Pennington's potential testimony. I was not advised by Leslie Baxter or anyone that Alton Mathis was willing to testify on behalf of Freeman. My recollection is that either Freeman or Ms. Baxter or both indicated Mathis was "not all there". He was not represented to be a credible witness. Freeman was not calling his nephew Mathis as a witness. This might sound like something he is considering 5 years later, but at the time Mathis was not going to ever be called. The risk of Mathis being in the county jail awaiting Freeman's trial were significant compared to the reality that he was not going to be called. We considered subpoenaing him for identity purposes but thought we could establish the issue without risking him being available to the

State. Is Mathis saying the gun, codeine and/or cocaine were in his sole custody, care and control? Sounds like he is saying it was someone else's. How does he have knowledge of that and care, custody and control of the premises and feel comfortable that he will not squirm on the stand?

5.

a. Alton Mathis: Because of the information told to me by Freeman regarding Mathis' mental state, Mathis' criminal history, and information related to an incident just prior to the arrest between Mathis and Freeman, I believed that Mathis would be an unpredictable witness who would likely present an opportunity for the State to illicit information that would undermine the defensive theory of the case. He was in custody during parts of the investigation. Freeman and I discussed bench warranting Mathis, and while I considered this possibility, I was concerned that the State would also interview him or get information from him that would be bad for Freeman. Regarding Mathis being a "minion" and Freeman being a more involved leader, Mathis' criminal history of three less than a gram cocaine State Jail cases would have corroborated that theory. On the other hand, those cocaine convictions and the gun conviction may have helped regarding Mathis being the one in care, custody and control of the controlled substances and the gun. Put Mathis on the stand and Freeman may not get the minimum of 25 years and they both may get convicted, but I do not see Mathis saving the day. We tried a clean case and after guilt innocence the State agreed to the minimum. Had these witnesses got on the stand and demonstrated an appearance of perjury, the State would have likely left it in the hands of the jury to decide 25 to life. Mathis had no major drug cases and no codeine cases. He had a prior gun TDC trip which would have subjected him to 15 to life. *See* Attachment A. In the last two felony charges filed against Mathis, Mathis' attorneys on two separate occasions asked for a psychological evaluation. This corroborates the information I recall being told about Mathis.

b. Kye Williams: I met with Kye several times and determined that his testimony would have been problematic. There was enough knowledge on his part that would have caused him to be an unpredictable witness whose testimony would not have held up on cross-examination. In stating that Freeman did not cross through the house to get to the studio the day Freeman was arrested, Williams' affidavit contradicts what he and other witnesses told me before trial.

c. Deandre Taylor: I do not recall speaking with Deandre Taylor, but the information he provided in his affidavit is inconsistent with what Freeman and every other witness I interviewed relayed to me - specifically, that Freeman went through the house, rather than around and directly to the studio, on the day of his arrest.

d. Carol Pennington: I do not recall speaking to Carol Pennington but it seems like I did. However, it was established at trial that other people in the house had care, custody, and control of the house, and that further testimony as to the receipt of mail and the like would have been redundant.

The primary defensive theory throughout the proceedings, and my continued belief, was that Alton Mathis or someone other than Marcus Freeman made the control buy and the police/CI either know that or have identified the wrong person. Marcus Freeman did reside with his mother somewhere other than the residence in question and he did go over to the residence to work on music with Kye Williams and possibly others. His nephew Alton Mathis and Alton's friend Deandre Taylor were staying in the living room and had significant links to the cocaine. Someone other than Freeman was in the bedroom where the gun was found and fled  as the police were entering. That seemed like a significant link connecting whoever ran to the gun and the codeine and reasonable doubt with respect to Freeman. The testimony of the officers during the trial regarding Freeman's wandering eye did not seem credible. I would need more time to refresh my memory but the lead officer was testifying and there was an issue about the identity of the person that made the controlled buy specifically an issue about Freeman having a wandering eye and it not ever being mentioned. The Chief prosecutor left the room immediately before the undercover officer testified. The undercover officer thereafter testified that she saw the wandering eye during the controlled buy. Seems like there were contradicting statements in the police report; we felt there was error; we made an offer of proof and provided case law. The way it unfolded at the time seemed like we were making headway that the officers were not credible regarding who made the controlled buy and that we were building the case that the officers were exaggerating the links related to Freeman. The potential defense witnesses I interviewed regarding the care, custody and control of the house provided contradictory information, and I believed that if they were put on the stand, they would have been subject to cross-examination and not have been credible. We believed the strategy to not call additional witnesses

provided Freeman with the best chance for the Jury to find reasonable
doubt.

(Docket Entry No. 13-25, pp. 15-19).

Freeman complains that counsel should have presented witnesses who could have shown that
Freeman did not live at the Keystone residence. Freeman fails to establish prejudice. "[T]o prevail
on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must
name the witness, demonstrate that the witness was available to testify and would have done so, set
out the content of the witness's proposed testimony, and show that the testimony would have been
favorable to a particular defense." *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009). Freeman
has offered the affidavits of the witnesses he claims counsel should have called. Freeman asserts that
they were available to testify at trial. As is shown in his affidavit, counsel was aware of these
witnesses. Counsel made a tactical decision not to call them. The defense theory was that Alton
Mathis, or someone other than Freeman, made the controlled buy and the police and confidential
informant identified the wrong person. Through testimony of Freeman's mother, counsel showed
that Freeman lived with his mother at a different location. Freeman went to the Keystone residence
to work on music with Kye Williams and others. Counsel presented evidence that Freeman's
nephew Alton Mathis and Alton's friend Deandre Taylor were staying in the living room and had
significant links to the cocaine. Counsel interviewed the witnesses regarding the care, custody and
control of the house. Because they provided contradictory information, counsel determined that
calling them to testify would subject them to cross-examination, and the inconsistencies in their
testimony would have been exposed.

Freeman has not shown that the proposed testimony of the requested witnesses would have been favorable to his defense theory. Freeman has failed to show there is a reasonable probability that, had his witnesses testified, the jury would have had a reasonable doubt concerning his guilt and that any errors were so serious they deprived the defendant of a fair trial. *See United States v. Mullins,* 315 F.3d 449, 456 (5th Cir. 2002). Throughout the testimony by the police officers, Freeman's trial attorney elicited testimony that no drugs were ever found on Freeman's person. Through his cross-examination, counsel tried to show that the drugs and weapons belonged to the people who lived in the Keystone residence. In his closing remarks, trial counsel advanced the defense that the drugs belonged to someone else. He emphasized the lack of evidence directly linking Freeman to the drugs found in the Keystone residence.

At trial, Officer Bryant testified that he arranged for an undercover officer and a confidential informant to purchase drugs from the Keystone residence. The officers later conducted a "no knock" search of the Keystone residence where they recovered drugs and weapons. Counsel's strategy was to show that Freeman did not possess the drugs. In light of the testimony of the arresting officers, Freeman has not shown that there was a reasonable probability that witnesses' testimony would have created reasonable doubt concerning his guilt. *See Mullins,* 315 F.3d at 456. Trial counsel's statements and cross-examinations conveyed the same defensive theory Freeman now says his witnesses would have testified about, *i.e.,* that he did not possess the drugs. There has been no showing that testimony from the requested witnesses that he did not possess the cocaine and codeine would have altered the result of the trial. Because Freeman has failed to show the result of the trial would have been different if his witnesses had testified, he has failed to establish any deficient

performance by his trial attorney on this issue. *See id.; Sayre v. Anderson,* 238 F.3d 631, 635 (5th Cir. 2001).

The state habeas court found:

> 4.    The applicant was represented in the primary case by counsel Troy Locklear.
>
> 5.    The Court finds that Troy Locklear provided an affidavit, it is credible and the facts asserted therein to be true.
>
> 6.    The Court finds that based on the credible affidavit of Troy Locklear, trial counsel interviewed multiple witnesses, discussed defensive theories with the applicant and after consultation with the applicant, presented a defensive theory that the police arrested the wrong person. *See State's Writ Exhibit C, Affidavit of Troy Lockear in cause no. 1238768-A.*
>
> 7.    The Court finds that based on the credible affidavit of Troy Locklear, trial counsel evaluated witnesses on the basis of whether their testimony would advance the defensive theory of the case and presented witnesses that corroborated the defensive theory.
>
> 8.    The Court finds that based on the credible affidavit of Troy Locklear, trial counsel made a strategic decision not to call witnesses that could, in trial counsel's opinion, harm the defensive theory of the case.

(Docket Entry No. 13-25, p. 29).

The state habeas court concluded:

> 1.    The applicant fails to demonstrate that counsel's representation fell below an objective standard of reasonableness or that with a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Mitchell v. State,* 68 S.W.3d 640, 642 (Tex. Crim. App. 2002); *Narvaiz v. State,* 840 S.W.2d 415, 434 (Tex. Crim. App. 1992) (citing *Strickland v. Washington,* 466 U.S. 668, 688 (1984)).

2.   The applicant fails to demonstrate that counsel provided representation that "amounted to incompetence under 'prevailing professional norms.'" *Harrington v. Richter,* 131 S. Ct. 770 (2011) (citing *Strickland v. Washington,* 466 U.S. at 690).

3.   The totality of the representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of trial counsel. *Harrington v. Richter,* 131 S. Ct. 770 (2011) (citing *Strickland v. Washington,* 466 U.S. at 690).

(Docket Entry No. 13-25, p. 29).

The state habeas court found the facts stated in trial counsel's affidavit to be true and concluded that Freeman had received reasonably effective assistance of counsel. The Court of Criminal Appeals expressly based its denial of habeas relief on these findings. These determinations are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Moore v. Johnson,* 194 F.3d 586, 604 (5th Cir. 1999) (op. on reh'g). Freeman has not produced clear and convincing evidence to rebut these findings.

Decisions on the presentation of evidence and witnesses are essentially strategic. Counsel is entitled to a presumption that his performance was adequate. Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy. *Wilkerson v. Cain,* 233 F.3d 886, 892-93 (5th Cir. 2000)(citing *United States v. Cockrell,* 720 F.2d 1423, 1427 (5th Cir. 1983)). There is no basis other than speculation to support Freeman's argument that the outcome of the trial would have been different had counsel called Freeman's witnesses. The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Freeman has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

### C.    Failure to Object to the Prosecutor's Closing Argument

Freeman asserts that trial counsel rendered ineffective assistance by failing to object to the prosecutor's improper closing argument. Deciding whether to object before a jury is a quintessential matter of trial strategy not to be second-guessed. *See, e.g., Hernandez v. Thaler*, 463 F. App'x 349, 356 (5th Cir. 2012) (counsel's decision not to object to prosecutor's statement during closing that suggested the victims' families would want a death sentence was not an unreasonable trial strategy when voicing an objection might, for example, undermine the legitimacy of the lawyer's own emotional appeals to spare his client's life); *Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011) (counsel's decision not to object to adverse witness testimony was not an unreasonable trial strategy when doing so would draw undue attention to that harmful testimony); *Hernandez v. Thaler*, 398 F. App'x 81, 87 (5th Cir. 2010) (counsel's decision not to object to the prosecutor's mischaracterization of witness testimony during closing argument was not unreasonable strategy when objecting would draw undue attention to that testimony); *see also Drew v. Collins,* 964 F.2d 411, 423 (5th Cir. 1992) (noting, in a pre-AEDPA case, that a "decision not to object to a closing argument is a matter of trial strategy").

As discussed in Section VII.B., *supra*, the prosecutor's argument was an answer to the argument of opposing counsel. Here, Locklear decided not to object to the prosecutor's argument that the jury would have to believe that all of the police officers were lying. Locklear could have reasoned that objecting would have sharpened the jury's focus on the prosecutor's fleeting remarks. Objecting also might have appeared to jurors to be an effort to hide the ball, a devastating consequence for a defense relying largely on jurors' assessments of the veracity of Freeman and the narrative created by Locklear. *See, e.g., Rivas v. Thaler*, 432 F. App'x 395, 404 (5th Cir. 2011)

(state habeas court was not unreasonable in determining that lawyer's decision to "object as little as possible on cross-examination in order to appear open and honest with the jury" was not unreasonable trial strategy). Locklear could reasonably have concluded that any objection would have been futile given that the defense theory was that the police were mistaken as to their identification of Freeman as the person who purchased drugs from the confidential informant. Counsel also tried to show that there was nothing linking Freeman to the cocaine, codeine, and weapons found in the home. Counsel tried to show that other individuals lived in the Keystone residence, and Freeman only used the recording studio in the back of the house. Nor can Freeman demonstrate that but for Locklear's failure to object, the outcome of the proceeding would have been different.

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Freeman has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

## IX.    The Improper Sentence Claim

### (Ground 7)

Freeman asks that "his sentence be significantly reduced because it is grossly disproportionate and unduly harsh because he is innocent of the charges. Even though said charged [sic] are within the statutory limit, Petitioner believes he has been wrongly convicted and deserves a chance at . . . a reduction of sentence . . ." (Docket Entry No. 4, pp. 18-19).

In cause number 1238767, the indictment charged Freeman as follows:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, MARCUS DESHUNN FREEMAN, hereafter styled the

Defendant, heretofore on or about OCTOBER 27, 2009, did then and there unlawfully, knowingly possess with intent to deliver a controlled substance, namely, COCAINE, weighing more than 4 grams and less than 200 grams by aggregate weight, including any adulterants and dilutants.

Before the commission of the offense alleged above, (hereafter styled the primary offense), on APRIL 3, 2000, in Cause No. 0834756, in the 185TH DISTRICT COURT of HARRIS County, Texas, the Defendant was convicted of the felony of POSSESSION OF A CONTROLLED SUBSTANCE.

Before the commission of the primary offense, and after the conviction in Cause No. 0834756 was final, the Defendant committed the felony of POSSESSION OF A CONTROLLED SUBSTANCE and was finally convicted of that offense on OCTOBER 8, 2001, in Cause No. 0885474, in the 262ND DISTRICT COURT of HARRIS County, Texas.

(Docket Entry No. 13-29, p. 1).

Freeman was convicted under the Texas Controlled Substances Act § 481.112(d), which is a first-degree felony.  (Docket Entry No. 13-2, pp. 48-49).  A first-degree felony "shall be punished by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years." TEX. PENAL CODE § 12.32 (West 2009).

In cause number 1238768, the indictment charged Freeman as follows:

The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, MARCUS DESHUNN FREEMAN, hereafter styled the Defendant, heretofore on or about OCTOBER 27, 2009, did then and there unlawfully, intentionally and knowingly possess with intent to deliver a controlled substance, namely, a compound, mixture and preparation containing not more than 200 milligrams of codeine per 100 milliliters and one or more nonnarcotic active medicinal ingredients in sufficient proportion to confer on the compound, mixture and preparation valuable medicinal qualities other than those possessed by the codeine alone, weighing AT LEAST 400 grams by aggregate weight, including any adulterants and dilutants.

Before the commission of the offense alleged above, (hereafter styled the primary offense), on APRIL 3, 2000, in Cause No. 0834756, in the 185TH DISTRICT COURT of HARRIS County, Texas, the Defendant was convicted of the felony of POSSESSION OF A CONTROLLED SUBSTANCE.

Before the commission of the primary offense, and after the conviction in Cause No. 0834756 was final, the Defendant committed the felony of POSSESSION OF A CONTROLLED SUBSTANCE and was finally convicted of that offense on OCTOBER 8, 2001, in Cause No. 0885474, in the 262ND DISTRICT COURT of HARRIS County, Texas.

(Docket Entry No. 13-25, p. 68).

Freeman was convicted of possession with intent to deliver a controlled substance, namely codeine, in the amount of at least 400 grams under Texas Controlled Substances Act § 481.114(e). (Docket Entry No. 13-4, pp. 59-60). An offense under this section is punishable by imprisonment "for life or for a term of not more than 99 years or less than 10 years." Tex. Controlled Substances Act § 481.114(e).

In both cause numbers, Freeman's punishment was enhanced by two prior and consecutive felonies to a term of imprisonment of not more than ninety-years or less than twenty-five. (Docket Entry No. 13-2, pp. 48-49; Docket Entry No. 13-4, pp. 59-60); TEX. PENAL CODE § 12.42(d). Freeman was sentenced to twenty-five years' imprisonment in both cause numbers. 288CR at 130–31; Docket Entry No. 13-4, pp. 59-60).

The state habeas court concluded: "8. The applicant fails to demonstrate that his punishment, within the statutory range of punishment for the offense committed, was grossly disproportionate or cruel and unusual. *Lockyer v. Andrade,* 538 U.S. 63, 73 (2003); *Samuel v. State,* 477 S.W. 2d 611 (Tex. Crim. App. 1972)." (Docket Entry No. 13-25, p. 30). The state court's decision was a

reasonable application of the law to the facts and was not contrary to clearly established federal law as determined by the Supreme Court of the United States.  Relief cannot be granted under 28 U.S.C. § 2254(d)(1).

## X.   The Claim Based on Cumulative Error

### (Ground 6)

Freeman asserts that the cumulative effect of the constitutional errors deprived him of a fair trial.  "[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992)).  Freeman has failed to demonstrate any constitutional errors, so this claim lacks merit.  Freeman is not entitled to habeas relief on this claim.

## XI.   Conclusion

Respondent's Motion for Summary Judgment, (Docket Entry No. 16), is GRANTED. Freeman's petition for a writ of habeas corpus is DENIED.  This case is DISMISSED.  Any remaining pending motions are DENIED as moot.

The Supreme Court has stated that the showing necessary for a Certificate of Appealability is a substantial showing of the denial of a constitutional right. *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) (citing *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000)).  Under that standard, an applicant makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or

that the issues are suitable enough to deserve encouragement to proceed further. *See Clark v. Johnson*, 202 F.3d 760, 763 (5th Cir. 2000). Where a district court has rejected a prisoner's constitutional claims on the merits, the applicant must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. 484.

This court denies Freeman's petition after careful consideration of the merits of his constitutional claims. This court denies a COA because Freeman has not made the necessary showing for issuance. Accordingly, a certificate of appealability is DENIED.

SIGNED at Houston, Texas, on _____, 2016.

_____
VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE